**WO**

IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF ARIZONA

| | |
|---|---|
| Eaglepitcher Management Company, | No. CV 04-870-PHX-MHM |
| Plaintiff, | **ORDER** |
| vs. | |
| Zurich American Insurance Company, | |
| Defendant. | |

Currently before the Court is Plaintiff's Motion for Partial Summary Judgment (Dkt.#140) and Defendant's Motion for Summary Judgment (Dkt.#147). After reviewing both motions and accompanying papers, the Court finds oral argument unnecessary and issues the following Order.

**I.     Factual Background**

EaglePitcher, Incorporated, ("EPI") sustained heavy losses as a result of a long term embezzlement scheme of one of its former employees, John Franklin Brock ("Brock"). Brock stole millions from EPI and its employee benefit plans and ultimately served nearly two years in prison.

This dispute centers around whether one of EPI's[1] insurers, Zurich North American Insurance Company ("Zurich"), is obligated to cover the loss associated with Brock.

After having worked as a Director of Management Information Systems for EPI, Brock was terminated from EPI at the end of March in 2002. While the parties dispute the motivation for his termination, with EPI claiming that it was because of the company's transfer from Cincinnati to Phoenix and Zurich claiming that it was because of suspicions about his dishonest behavior, they do not appear to dispute that he was in fact terminated from the company by March 31, 2002. After his termination, he continued to work for EPI through an entity called "Interconnect, Inc." to assist in the transition to Phoenix until July 31, 2002.[2]

The investigation that ultimately led to Brock's arrest had its origins in December 2001, when an EPI employee anonymously reported that Brock was receiving kickbacks for steering EPI business to one of Brock's own companies, Open Systems Solutions. (Dkt.#142 ¶ 8; Dkt.#156 ¶ 8) Based on the anonymous tip, EPI's CEO, John Weber, hired an experienced corporate security specialist, Randall W. Kincaid ("Kincaid") to investigate Brock. (Dkt.#142 ¶ 8,9; Dkt.#156 ¶ 8, 9) Kincaid began his investigation in January 2002. (Dkt.#142 ¶ 10; Dkt.#156 ¶ 10) However, on March 28, 2002, the date EPI's Cincinnati office closed, Kincaid noted Brock's termination and declared the case "closed unless additional information is obtained to warrant [its] reopening." (Dkt.#142 ¶ 12; Dkt.#156 ¶ 12)

On June 13, 2002, Kincaid reopened his investigation of Brock, having learned on that date that EPI had engaged Brock as a contract IT services provider, doing business as Inter-Connect. (Dkt.#142 ¶ 13; Dkt.#156 ¶ 13) Toward the end of July, new concerns arose

---

[1] After EPI filed for bankruptcy, its claims were assigned to EaglePitcher Management Company ("EPMC"), which is now prosecuting this action.

[2] EPI claims that Brock's work during this time period is best characterized as that of an independent contractor; however, Zurich disputes this "legal characterization" of his work.

1  regarding Brock's services as a contract IT consultant. One EPI employee contacted Kincaid
2  on July 26, 2002 to report that he had found some double-billing on Brock's Inter-Connect
3  invoices and that Brock was trying to charge for the replacement of a laptop that was stolen
4  during Brock's visit to EPI's Phoenix office. (Dkt.#142 ¶ 14; Dkt.#156 ¶ 14) Kincaid hired
5  an accountant to audit records of transactions between EPI and various IT "outsource"
6  contractors potentially associated with Brock in mid-August, 2002. (Dkt.#142 ¶ 18;
7  Dkt.#156 ¶ 18) On August 27, 2002, the accountant confirmed that Brock had engaged in
8  double-billing for the same work. (Dkt.#142 ¶ 20; Dkt.#156 ¶ 20) Kincaid also learned that
9  Brock was operating an aviation business through which he diverted money and personal
10 property from EPI. (Dkt.#142 ¶ 21; Dkt.#156 ¶ 21) He also learned of other dishonest acts
11 involving Brock. (Dkt.#142 ¶ 22; Dkt.#156 ¶ 22) Kincaid and his investigators approached
12 law enforcement authorities about this time and made presentations to the Cincinnati Police
13 Department and the Federal Bureau of Investigation on September 6 and September 25,
14 2002. (Dkt.#142 ¶ 23; Dkt.#156 ¶ 23) Finally, on October 24, 2002, Brock was arrested by
15 the Cincinnati Police Department on theft charges. (Dkt.#142 ¶ 24; Dkt.#156 ¶ 24)

16 Throughout the Brock investigation, Kincaid took great care to assure that, as far as
17 possible, the suspicions about Brock, and the activities and findings of his team, were kept
18 strictly confidential. (Dkt.#142 ¶ 26; Dkt.#156 ¶ 26) In its early stages, the persons who
19 were aware of the investigation were limited to Weber (EPI's CEO), David Krall (EPI's
20 general counsel), and John Sullivan (EPI's Corporate Controller and the individual who
21 discovered the double-billing). (Dkt.#142 ¶ 27; Dkt.#156 ¶ 27) Even as the investigation
22 intensified in August and September 2002, no additional EPI personnel were apprised of the
23 investigators' findings. Among those who remained ignorant about the details of the Brock
24 investigation until after Brock's arrest was EPI's Risk Manager, Paul Harper. (Dkt.#142 ¶
25 27, 28; Dkt.#156 ¶ 27, 28)

26 It is undisputed that during the entire period of Brock's employment with EPI, the
27 company was continuously insured under a series of policies covering employee dishonesty
28 risks. (Dkt. # 142 ¶ 35; Dkt.# 156 ¶ 35) The policy in effect during much of the Brock

investigation was issued by Federal Insurance Company ("Federal"). (Dkt.#142 ¶ 47; Dkt.#156 ¶ 47) This policy expired on August 1, 2002, just as the Brock investigation began to accelerate. (Dkt.#142 ¶ 48; Dkt.#156 ¶ 48) On that same date, a new policy issued by Zurich took effect. (Dkt.#142 ¶ 51; Dkt.#156 ¶ 51)

Both policies require a report to the insurer promptly upon the policyholder's discovery of loss, or of an occurrence which may become a loss. (Dkt.#142 ¶ 61; Dkt.#156 ¶ 61) Both policies were specifically endorsed, however, to modify their reporting provisions so that they are triggered only by the discovery of loss by EPI's risk manager. (Dkt.#142 ¶ 64-65; Dkt.#156 ¶ 64-65) From February 2002 to October 15, 2002, Paul Harper ("Harper") held the title of EPI's Risk Manager. (Dkt.#142 ¶ 31; Dkt.#156 ¶ 31) By October 15, 2002, Harper had transitioned this role to Tom Scherpenberg ("Scherpenberg"). (Dkt.#142 ¶ 32; Dkt.#156 ¶ 32)

Because of the secrecy with which the investigation of Brock was pursued, Harper did not learn of the investigation into Brock's activities until a conversation with Weber "several weeks" before Brock's arrest. (Dkt.#142 ¶ 33; Dkt.#156 ¶ 33) Harper's recollection is that, in conversation, Weber advised him that Kincaid "had been looking into Frank Brock's activities as the IT Director." (Dkt.#142 ¶ 33; Dkt.#156 ¶ 33) Scherpenberg did not become aware of Kincaid's findings until Brock's arrest on October 24, 2002. (Dkt.#142 ¶ 34; Dkt.#156 ¶ 34)

Scherpenberg consulted with personnel from EPI's insurance broker, Aon Risk Services, and Aon provided written notice of Brock's crimes against EPI and EPI's pension plans to Zurich on November 4, 2002. (Dkt.#142 ¶ 73; Dkt.#156 ¶ 73) Aon also provided written notice to Federal on March 31, 2003. (Dkt.#142 ¶ 74; Dkt.#156 ¶ 74)

Federal declined coverage on April 21, 2003, pointing to a policy provision excluding coverage for loss "unless discovered and written notice thereof is given within 60 days following termination" of the policy. (Dkt.#142 ¶ 76; Dkt.#156 ¶ 76) Noting that the Federal Policy had expired on August 1, 2002, Federal asserted that EPI's report of the Brock loss had come too late. (Dkt.#142 ¶ 77; Dkt.#156 ¶ 77) However, on May 1, 2003, Federal

- 4 -

clarified that its position applied only to EPI's corporate loss and did not apply to any loss suffered by EPI's pension plans, citing a separate policy provision that modified the 60-day post-termination reporting period to one year for Employee Benefit Plan Coverage. (Dkt.#142 ¶ 78; Dkt.#156 ¶ 78) Federal remained adamant, however, that "there is no coverage for losses incurred with Corporate Assets." (Dkt.#142 ¶ 79; Dkt.#156 ¶ 79)

Zurich initially took no position regarding coverage for the Brock loss; however, its Claim Counsel, Robert Cooper, orally advised an Aon Claim Coordinator, Hector Ortiz, that EPI's loss "appeared to fall outside the coverage of the Zurich policy." (Dkt.#142 ¶ 81; Dkt.#156 ¶ 81)

EPI submitted proofs of loss asserting $732,585.62 in direct loss from pension plan assets, $6,156,168.37 in direct loss from corporate assets, and $2,166,008.21 in loss assignable to both pension plan and corporate assets. (Dkt.#142 ¶ 85; Dkt.#156 ¶ 85)

Both insurers responded by reserving rights and seeking additional information. (Dkt.#142 ¶ 86; Dkt.#156 ¶ 86) After initially filing suit against both insurers, EPI settled with Federal. (Dkt.#142 ¶ 97; Dkt.#156 ¶ 97) Zurich has denied all liability and asserts that coverage for the Brock loss is defeated by the "Cancellation As to Any Employee" condition. It also asserts that EPI discovered the Brock loss in time to report it under the Federal Policy.

EPI moved for summary judgment regarding two aspects of this litigation: (1) that, for purposes of application of the "Loss Sustained During Prior Insurance" provision of Zurich Crime Policy No. FID 525266800 (the "Zurich policy"), issued to EPI, EPI did not discover its corporate loss arising from dishonest acts of former employee Brock until after the time within which to discover and report such loss under the Crime Coverage section of Federal Insurance Company Executive Protection Policy No. 8157-73-98A DTO ("the Federal policy") had expired, and (2) that the "Cancellation As to Any Employee" condition of the Zurich policy, which took effect on August 1, 2002, does not preclude coverage for EPI's loss arising from dishonest acts committed by Brock before May 1, 2002, on which date coverage for Brock under the Federal policy ceased by virtue of Brock's March 31, 2002 termination. (Dkt.#140).

Zurich, in turn also moved for summary judgment, arguing that "[w]here the undisputed facts demonstrate that EPI discovered (1) Brock's commission of dishonest acts, and (2) a loss situation before [the] inception of the Zurich policy, there is no coverage as a matter of law. (Dkt.#148) It also argues that the "common law 'known loss doctrine' precludes coverage where EPI knew of its loss prior to obtaining the Zurich policy." (Dkt.#148)

## II. Relevant Portions of Both Policies

### A. The Zurich Policy

#### (1) The Loss Sustained During Prior Insurance Provision

The Zurich Policy contained the following provision, which will be referred to as the "LSDPI" provision:

> **8. Loss Sustained During Prior Insurance**
> If you, or any predecessor in interest, sustained loss during the period of any prior insurance that you or the predecessor in interest could have recovered under that insurance except that the time within which to discover loss had expired, we will pay for it under this insurance, provided:
>
> (1) This insurance became effective at the time of cancellation or termination of the prior insurance; and
>
> (2) The loss would have been covered by this insurance had it been in effect when the acts or events causing the loss were committed or occurred.

(Dkt.# 149 Exh. A ¶ 8)

#### (2) The "Cancellation As to Any Employee" Provision

The Zurich policy also contained the following "Cancellation As to Any Employee" provision, which will subsequently be referred to as the "CATAE" provision:

> This insurance is cancelled as to any "employee":
>
> a. Immediately upon discovery by: (1) You; or (2) Any of your partners, officers or directors not in collusion with the "employee", of any dishonest act committed by that employee" whether before or after becoming employed by you.

(Dkt.# 149 Exh. A at 000177)

### B. The Federal Policy

### (1) The 60-day Discovery Tail

Paragraph 6 of the Federal Policy contained the following provision, which will be referred to as the "60-day Discovery Tail": "Coverage under this coverage section does not apply to: . . . (I) Loss unless discovered and written notice is given to the Company with in . . . sixty days following termination in its entirety of Crime Coverage provided to the insured by the company. . ." (Dkt.#149 Ex. B at EP050732)  Because the Federal policy terminated on August 1, 2002, EPI had to discover and report loss to Federal by September 30, 2002 in order to receive coverage.

### (2) Knowledge or Discovery of the Risk Manager

Section 22 of the Federal Policy provided as follows: "22. Upon knowledge or discovery by the Risk Manager of the Insured of loss or of an occurrence which may become a loss, written notice shall be give to the Company as soon as practical after such discovery." (Dkt.# 149 Ex. B at EP060742)

This endorsement rewrote the following, italicized language of the original Subsection 22: "Upon knowledge or discovery *by a proprietor, partner, officer or Insurance Representative of any Insured* of loss or of an occurrence which may become a loss, written notice shall be given the Company *at the earliest practicable moment, and in no event later than 90 days after discovery*." (Dkt.# 149 Ex. B ¶ 22 [EP060737])

This section was specifically negotiated between Federal and EPI to require only the Risk Manager to discover and report on loss and also to eliminate the 90-day absolute deadline for reporting after discovery.

## III. Analysis

### A. Summary Judgment Standard

A motion for summary judgment may be granted only if the evidence shows "that there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law." FED. R. CIV. P. 56(c). A material issue of fact is one that affects the outcome of the litigation and requires a trial to resolve the differing versions of the truth. *S.E.C. v. Seaboard Corp.*, 677 F.2d 1301, 1305-06 (9th Cir. 1982). To defeat the

1  motion, the non-moving party must show that there are genuine factual issues "that properly
2  can be resolved only by a finder of fact because they may reasonably be resolved in favor of
3  either party." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 250 (1986). Summary
4  judgment is appropriate against a party who "fails to make a showing sufficient to establish
5  the existence of an element essential to that party's case, and on which that party will bear
6  the burden of proof at trial." *Celotex Corp. v. Catrett,* 477 U.S. 317, 322 (1986).

The interpretation of an insurance contract is a question of law for the court to decide. *Thomas v. Liberty Mut. Ins. Co.*, 842 P.2d 1335, 1337 (Ariz. App. 1992); *McHugh v. United Service Auto Ass'n,* 164 F.3d 451 (9th Cir. 1999). Under Arizona law, an insurance policy "must be read as a whole in order to give a reasonable and harmonious meaning and effect to all of its provisions." *Nichols v. State Farm Fire & Cas.*, 857 P.2d 406, 408 (Ariz. App. 1993). Arizona courts "construe a clause subject to different interpretations by examining the language of the clause, public policy considerations, and the purpose of the transaction as a whole." *State Farm Mut. Auto Ins. Co. v. Wilson*, 782 P.2d 727, 729 (Ariz. 1989). Unambiguous provisions must be given effect as written. *Benevides v. Arizona Property & Cas. Ins. Guar. Fund*, 184 Ariz. 610, 619, 911 P.2d 616 (1995).

### B. EPMC's Motion for Summary Judgment

EPMC moves for partial summary judgment that (1) for purposes of Zurich's LSDPI provision, EPI did not discover the corporate loss arising from the Brock loss until after the time in which to discover and report such loss under the Federal Policy had expired and (2) that the CATAE provision of the Zurich policy does not preclude coverage from dishonest acts committed by Brock before May 1, 2002, on which date coverage for Brock under the Federal policy ceased by virtue of Brock's March 31, 2002 termination.

#### (1) Zurich's "Loss Sustained During Prior Insurance" Provision

Zurich's "Loss Sustained During Prior Insurance" ("LSDPI") Provision is designed to ensure continuous coverage when the insured switches to a new insurer:

> **8. Loss Sustained During Prior Insurance**
> If you, or any predecessor in interest, sustained loss during the period of any prior insurance that you or the predecessor in

> interest could have recovered under that insurance except that the time within which to discover loss had expired, we will pay for it under this insurance, provided:
>
> > (1) This insurance became effective at the time of cancellation or termination of the prior insurance; and
> >
> > (2) The loss would have been covered by this insurance had it been in effect when the acts or events causing the loss were committed or occurred.

(Dkt.# 149 Exh. A ¶ 8) Under this provision, if EPI sustained a loss during the Federal policy that it could have recovered for except that the time period in which to discover the loss had expired, Zurich, as the successor insurer, would cover the loss.

Thus, determining whether *Federal* would have covered the claim becomes the key question for determining whether *Zurich* must cover the claim. If Federal would have covered the claim (meaning that the time in which to discover the loss *had not* expired), then Zurich is not obligated to cover the claim. If Federal would not have covered the claim (meaning that the time in which to discover the loss *had* expired), then Zurich is obligated to cover the claim.

To analyze EPI's assertion that it did not discover the corporate loss arising from the Brock loss until after the time in which to discover and report such loss under the Federal Policy had expired, the Court must determine "what" discovery meant, as well as "to whom" the discovery provision applied, and finally "when" the time in which to discover and report such loss under the Federal Policy expired. Each item is discussed below.

### (a) "What" Discovery Meant under the Federal Policy

Both parties agree that although the Federal policy did not expressly define "discovery," the classic loss-reporting definition set forth in *American Surety Co. v. Pauly*, 170 U.S. 133 (1898) should apply. Under this test, discovery occurs when the insured "had knowledge – not merely suspicion – of the existence of such facts as would justify a careful and prudent man in charging another with fraud or dishonesty." *Id.* This test has been adopted and discussed by a number of courts at length, including the Ninth Circuit, which recently explained as follows:

> This standard makes sense because a careful and prudent person does not lightly charge another with committing fraud or an act of dishonesty. Such charges may disrupt the fabric of the employer's workplace and may often set into motion further investigations by responsible governmental agencies and affected parties. If such a charge is later determined incorrect, the employer may be liable for defamation, slander, breach of contract, or other claims. For such reasons, it is reasonable to interpret the fidelity bond's contractual language in a manner permitting the employer to be careful and cautious before asserting that a fraud or dishonesty has occurred.

*Gulf USA Corp v. Federal Ins. Co.*, 259 F.3d 1049, 1059 (9th Cir. 2001). Thus, the "what" that needed to happen for "discovery" to occur was that some individual or group of individuals at EPI had to actually know, not merely suspect, facts that would justify "a careful and prudent man" in charging Brock with fraud or dishonesty.

### (b) "To Whom" the Discovery Provision Applied

The Federal policy was a negotiated document; the original version provided that discovery applied to "a proprietor, partner, officer or Insurance Representative of any Insured."[3] (Dkt.# 149 Ex. B ¶ 22 [EP060737]) However, this provision was deleted and in its place the parties adopted a new provision that makes it clear that discovery applies to the Risk Manager only. The new provision read as follows: "[u]pon knowledge or discovery *by the Risk Manager* of the Insured of loss or of an occurrence which may become a loss, written notice shall be given to the Company as soon as practical after such discovery." (Dkt.# 149 Ex. B at EP060742) (emphasis added) Both the new and the old versions are contained in the final contract; however, the new version states that "It is understood and agreed that Section 22, Notice-Proof-Legal Proceedings, is deleted in its entirety and replaced with" the newer version. Thus, the plain language of the policy makes clear that the parties carefully considered the very important decision of whose knowledge would be the

---

[3] The full version of this provision, which was subsequently amended, originally read as follows: "Upon knowledge or discovery *by a proprietor, partner, officer or Insurance Representative of any Insured* of loss or of an occurrence which may become a loss, written notice shall be given the Company *at the earliest practicable moment, and in no event later than 90 days after discovery*." (Dkt.# 149 Ex. B ¶ 22 [EP060737]) (emphasis added)

- 10 -

"trigger" that would create reporting requirements and whose laxity in reporting could potentially result in an insurance claim that was denied. Rather than have this responsibility spread and diluted among a group of officers and corporate executives, EPI negotiated to have this responsibility rest solely with the Risk Manager.

A similar provision occurs in the Zurich policy, where an endorsement was added to clarify that only the Risk Manager was responsible for the discovery and reporting of loss. The endorsement read as follows: "Under Section B, 5, entitled "Duties in the Event of Loss" use of the word "you " is intended to mean "The Risk Manager." However, if none exists then the word "you" shall retain its original definition."[4] (Dkt.#149 Ex. A at 000193)

Thus, in both contracts, EPI negotiated with its insurers to change the standard language of the contract to allocate responsibility for the reporting and discovery of loss solely with the Risk Manager. The discovery of loss by any other individual within the corporation was immaterial; the parties agreed to the bright-line rule that discovery by the Risk Manager was what mattered. Thus, for the purposes of analyzing this provision, it is irrelevant whether any other individual at EPI "discovered" Brock's dishonest acts; the sole question that matters is when EPI's Risk Manager knew or discovered the acts. Zurich concedes this point in its response, explaining that "the requirement to give notice to Federal was triggered only by 'knowledge or discovery by the Risk Manager.'" (Dkt.# 154 at 7)

### (c) "When" Reporting of the Discovery Had to Occur

Under the Federal Policy, there were two provisions that affect the timing of the reporting requirement. The first provision stated that after discovery, the Risk Manager was

---

[4] Even assuming that the Zurich policy did not contain such a provision, however, the definitions in the Federal policy would still determine whether Federal would have covered the claim. Attempting to import the definitions of a successive contract and apply them to a contract that was drafted and defined with prior (and possibly wholly different) terms would be extremely difficult, if not impossible. Thus, for purposes of analyzing Zurich's LSDPI provision, the Court is analyzing the Federal policy according to Federal's terms. The Court notes that Zurich's policy has a similar provision merely to emphasize that Zurich is not unfairly prejudiced by the Federal definition. It happened to have a similar provision in its own contract.

to give written notice to "the Company [Federal] as soon as practical after such discovery." (Dkt.# 149 Ex. B at EP060742) This provision, like the one discussed above, was a negotiated provision that replaced an earlier version that stated that the reporting had to occur "at the earliest possible moment, and in no event later than ninety days after such discovery." (Dkt.# 149 Ex. B at EP060737) Zurich initially argued that the elimination of the ninety day outside limit meant that coverage would continue indefinitely for events that were discovered long after the Federal policy had expired, as long as Federal was timely notified of the loss. (Dkt.#154 at 8-9) However, this interpretation would require the court to ignore another provision of the contract completely.

The other provision, paragraph 6 of the policy, provided that "Coverage under this coverage section does not apply to: . . . (I) Loss unless discovered and written notice is given to the Company within . . . sixty days following termination in its entirety of Crime Coverage provided to the insured by the company. . . ." (Dkt.#149 Ex. B at EP050732) This provision fixes a temporal end-point for Federal's obligations under the policy regardless of when loss is discovered. This provision does not directly conflict with the prior provision, and it is possible to give meaning to both provisions by finding that discovery after the 60-day tail following the termination of the policy meant that there was no coverage regardless of the promptness of the Risk Manager's reporting of the loss to Federal. Because the Federal policy terminated on August 1, 2002, this interpretation would mean that EPI had to discover and report loss to Federal by September 30, 2002 in order to receive coverage. Zurich appears to concede that this interpretation is correct in its cross motion for summary judgment when it concludes, "Thus, EPI had coverage under the Federal Policy for a loss involving employee dishonesty during its policy period so long as it was discovered by September 30, 2002." (Dkt.#148 at 6)

Thus, the "when" requirement meant that the loss had to be discovered and reported to Federal no later than September 30, 2002 in order for there to be coverage and that the Risk Manager had a duty to report any such qualifying loss "as soon as practical."

**(d) Summary**

Combining the prior points discussed above, for there to be coverage for the Brock loss under the Federal policy, EPI's Risk Manager had to discover (not merely suspect) facts that would justify a careful and prudent man in charging another with fraud or dishonesty no later than September 30, 2002.

### (2) Factual Application

#### (a) Who was the Risk Manager?

Applying this test to the facts provided in the summary judgment motions, the Court is required to determine who EPI's Risk Manager was during the relevant time period. Zurich rather creatively argues that EPI's acting Risk Manager was "constructively" relieved of duty by EPI's CEO, John Weber, because the acting Risk Manager, as a suspected accomplice of Brock, was not informed of the ongoing investigation regarding Brock until shortly before Brock was arrested. However, there appears to be no basis for this argument in law or in fact. There is no evidence that Weber was even aware of employee dishonesty insurance reporting obligations, much less that he intended to relieve Harper of his duties in this respect.

Moreover, such an interpretation would do violence to the parties' clear intent to shift the reporting requirements onto the Risk Manager. These were sophisticated parties engaging in an arms-length transaction. The insurer's choice to accept EPI's preference that discovery obligations rest with the Risk Manager rather than the CEO or other officers meant that the insurers also chose to accept the increased risk that the Risk Manager, as a lower-ranking employee of the company, might be informed of loss at a later date than the individuals in charge of running the company such as the company's CEO.

Moreover, the insurer could have added a clause stating that if the Risk Manager was suspected of dishonesty, that the reporting requirements would shift to the CEO. However, it did not. Instead, Federal agreed that it was the knowledge of the Risk Manager, and the Risk Manager alone, that governed the discovery and reporting requirement. Furthermore, even if a dishonest Risk Manager might have theoretically invalidated the reporting requirement (the Risk Manager's knowledge could not be the trigger for loss reporting if the

Risk Manager *is* the dishonest employee, or is in collusion with him), this hypothetical is not before the Court. There is no allegation that the Risk Manager was in fact dishonest. The fact that he was initially suspected of collusion with Brock simply had the practical consequence that he was not informed of the investigation until very late in the game. This possibility was something that the insurers (both Federal and Zurich) agreed to by not specifying otherwise in their contract.[5]

Because it is undisputed that Paul Harper held the title of EPI's Risk Manager from February 2002 to October 15, 2002 (Dkt.#142 ¶ 31; Dkt.#156 ¶ 31), the key inquiry becomes whether Paul Harper knew facts that would justify a careful and prudent man in charging Brock with fraud or dishonesty on or before September 30, 2002.

Zurich's brief almost completely ignores this question and instead focuses on the dates that EPI's CEO, other officers, and investigator learned of the Brock loss. (Dkt.#154 at 5) However, as explained above, the only relevant inquiry (at least, as far as the LSDPI provision is concerned) is whether EPI's Risk Manager, Paul Harper, became aware of the Brock loss before September 30, 2002. If he did, then Federal would have been required to cover the loss, provided that the other requirements of the policy were met. If he did not, however, then even if all of the other requirements of the policy were met, Federal would not have covered the Brock loss.

It is undisputed that "Harper testified that he did not learn of the existence of the investigation into Brock's activities until a conversation with Weber 'several weeks' before Brock's arrest." (Dkt.# 142 ¶ 33; Dkt#156 ¶ 33) It is also undisputed that "Harper's recollection is that, in conversation, Weber advised him that Kincaid 'had been looking into Frank Brock's activities as the IT director.'" (Dkt.#142 ¶ 31; Dkt.#156 ¶ 31) Brock was arrested on October 24, 2002. Thus, the only evidence before the Court is that at some point prior to October 24, 2002, Harper knew that Brock was being investigated. Drawing all

---

[5] Obviously, if Zurich had a problem with the Federal policy, it could have refused to agree to the LSDPI provision.

factual inferences in favor of the non-moving party, Zurich, the Court assumes for purposes of discussion that Harper learned that Brock was being investigated before September 30, 2002, construing "several weeks" as potentially including the approximately four intervening weeks that would be necessary for this assumption to be correct.

However, even assuming that Harper learned of the investigation prior to September 30, 2002, merely learning of an investigation about Brock would not justify a careful and prudent man in charging Brock with fraud or dishonesty. (Dkt.#146, Exh. P at 30:1-5) It is further undisputed that "[e]ven as the investigation intensified in August and September 2002, no additional EPI personnel [besides Weber, Sullivan, Krall, and one contract investigator] were apprised of the investigator's findings." (Dkt.#142 ¶ 27, 28; Dkt.# 156 ¶ 27, 28) Thus, the most Harper could have known as of September 30, 2002 (drawing all factual inferences in favor of Zurich) was that Brock was being investigated; Harper could not have known any of the investigator's findings regarding Brock. However, as explained at length above, mere suspicions of unlawful behavior are insufficient to meet the *Pauly* standard; actual knowledge of unlawful behavior is required. *See Gulf USA*, 259 F.3d at 1059; *Hartford Acc. & Indem. Co. v. Hattiesburg Hardware Stores*, 49 So.2d 813, 819 (Miss. 1951) ("To be aware of a loss sustained by reason of facts constituting larceny or embezzlement there must necessarily be knowledge of facts which would constitute the crime, and the charge of so serious a crime cannot be safely based on mere inferences or suspicions . . .").

For these reasons, the Court will grant EPMC's motion for partial summary judgment that, for purposes of Zurich's LSDPI provision, EPI did not discover its corporate loss arising from the dishonest acts of Brock until after the time within which to discover and report such loss under the Crime Coverage section of the Federal policy had expired.

**(2)     Zurich's "Cancellation As To Any Employee" Provision**

EPMC also moves for partial summary judgment that the "Cancellation As to Any Employee" condition of the Zurich policy, which took effect August 1, 2002, does not preclude coverage for EPI's loss arising from dishonest acts committed by Brock before May

1, 2002, on which date coverage for Brock under the Federal policy ceased by virtue of Brock's March 31, 2002 termination.

The Zurich policy contained the following "Cancellation As to Any Employee" provision, which will subsequently be referred to as the "CATAE"provision:

> This insurance is cancelled as to any "employee":
>
> a. Immediately upon discovery by: (1) You; or (2) Any of your partners, officers or directors not in collusion with the "employee", of any dishonest act committed by that employee" whether before or after becoming employed by you.

(Dkt.# 149 Exh. A at 000177) This provision appears designed to prevent the insurer from having to cover "nonaccidental" loss that would result from an insured's knowing continual employment of a dishonest employee. Zurich argues that this provision prevents coverage for the Brock loss because EPI's CEO and/or investigator became aware of Brock's dishonest acts before the Zurich policy took effect on August 1, 2002.

However, this provision simply does not apply to the losses at issue here. Brock was not an "employee" whose fidelity was insured by Zurich during its policy term, so there was nothing to "cancel." The plain language of the CATAE provision applies to cancel coverage only for a person who qualifies as an "employee." The Zurich policy defines "employee" as "any natural person . . . while in your service (and for 90 days after termination of service)." (Dkt.# 142 ¶ 57) It is undisputed that Brock's employment by EPI was terminated on March 31, 2002. (Dkt.#149 ¶ 48) While Zurich disputes the motivation for Brock's termination, suggesting that it was related to suspicions about his dishonesty, Zurich's own Zurich's Statement of Undisputed Material Facts states that "Kincaid shut down his initial investigation on March 28, 2002, when Brock was terminated as an employee in conjunction with EPI's moving its headquarters to Phoenix, Arizona." (Dkt.#149 ¶ 48) Regardless, the reason Brock was terminated is irrelevant to the question of whether he qualified as an "employee" under the Zurich policy – which is the only question that is under discussion for purposes of determining whether the CATAE condition can be applied here. Brock *never* qualified as an "employee" of EPI during the Zurich policy period (August 1, 2002) – and

indeed, neither party had any reason to anticipate that his ongoing fidelity would be insured under the policy at the time that it was purchased. For this reason, the CATAE condition is simply inapplicable to the circumstances of this case.

Moreover, the dishonest acts for which coverage is sought all took place *before* EPI discovered Brock's dishonesty. EPMC is not seeking coverage from Zurich *directly*, for the dishonest acts of Brocks that occurred after August 1, 2002. Instead, EPMC seeks coverage from Zurich *indirectly* by virtue of the LSDPI provision, for acts that occurred while Brock was still employed by EPI and EPI was still ignorant of his dishonesty. These acts *would* have been covered under the Federal Policy except that the time in which to report such acts had expired. However, as explained above, the LSDPI provision of the Zurich policy makes Zurich responsible for losses that Federal would have covered but for the expiration of the discovery and reporting period.

Moreover, the function of a CATAE condition is to relieve the insurer of responsibility for loss caused by dishonest acts of an employee which are committed *after* the employer has learned that the employee is dishonest. However, all coverage for Brock's dishonesty under EPI's crime insurance ended on April 30, 2002, thirty days after his termination in connection with EPI's headquarters move. All dishonest acts for which coverage is sought thus necessarily took place before that date. Even if the CATAE condition otherwise could apply, it would not here because Brock's dishonesty was not "discovered" by EPI, nor any officer or director of EPI, until well after April 30, 2002. Brock's dishonesty was not "discovered" by EPI before he committed any of the dishonest acts for which EPMC is seeking coverage under the Zurich policy. For this reason, the CATAE condition does not apply.

Adopting Zurich's reading of the policy would require the Court to ignore the LSDPI provision as well as the fact that Brock had already been terminated months before the Zurich policy was issued. Quite simply, the dishonest acts for which EPMC is seeking coverage occurred months *before* EPI discovered Brock's dishonesty. If Zurich did not want to be liable for such acts, it should not have agreed to the LSDPI provision. Having agreed to the

1 LSDPI provision, it cannot not complain that it must cover dishonest acts that occurred well before EPI had any suspicion that Brock was dishonest.

For this reason the Court grants partial summary judgment that the CATAE provision of the Zurich policy does not preclude coverage for EPI's loss arising from dishonest acts committed by Brock before May 1, 2002, on which date coverage for Brock under the Federal policy ceased by virtue of Brock's March 31, 2002 termination.

### C. Zurich's Motion for Summary Judgment

Zurich cross-moves for summary judgment, arguing that "where the undisputed facts demonstrate that EPI discovered (1) Brock's commission of dishonest acts, and (2) a loss situation before inception of the Zurich policy, there is no coverage as a matter of law." (Dkt.#148 at 9) However, as explained at length above, EPI did not "discover" the Brock "loss situation" until after the time to discover and report loss under the Federal policy had expired. Zurich's claim that EPI "discovered" the Brock loss situation before August 1, 2002 fails for the same reason that its claim that EPI "discovered" the Brock loss situation before September 30, 2002 fails. Zurich agreed to the LSDPI provision discussed at length above. Under this provision, Zurich agreed to cover losses that Federal would have covered but for the termination of the Federal policy. Under the Federal policy (and coincidentally, also under the Zurich policy), discovery had a very specialized meaning, and occurred only when EPI's Risk Manager had discovered (not merely suspected) facts that would justify a careful and prudent man in charging another with fraud or dishonesty. As discussed at length above, this did not occur before September 30, 2002, much less before August 1, 2002.

Zurich also argues that "even EPI concludes it discovered the loss by August 2002 and prior to the expiration of Federal's extended discovery period." (Dkt.#148 at 16) As support for this statement Zurich states that "August 2002 began with CEO Weber emphatically exhorting Kincaid to "nail the bastard" and that EPI learned a variety of facts demonstrating Brock's dishonesty, including that (1) Brock had power of attorney for numerous service providers, (2) there existed theft of EPI cell phone services, including payment by EPI for telephone lines for Brock's aviation business, (3) Brock attempted to steal a $198,000 AT&T

1 rebate from EPI, (4) Brock was defrauding EPI's pension fund by passing off personal
2 expenses as IT expenses, (5) there was further evidence of Brock's double billing, (6) Brock
3 forged invoices, and (7) Brock stole truckloads of EPI office and computer equipment.

The core problem with all of these facts, however, is that the Risk Manager at EPI was the only individual whose knowledge mattered for purposes of the Federal policy (and hence, the Zurich LSDPI provision). As explained above, this individual had no knowledge of Brock's dishonesty before September 30, 2002.

Finally, the Court need not venture into uncharted territory and attempt to predict how whether Arizona courts would adopt the "known loss doctrine." The language of the insurance policies controls the outcome here. The policies mandate the denial of Zurich's cross-motion for summary judgment.

**Accordingly,**

**IT IS HEREBY ORDERED** granting EPMC's motion for partial judgment (1) that, for purposes of application of the "Loss Sustained During Prior Insurance" provision of Zurich Crime Policy No. FID 525266800 issued to EPI, EPI did not discover its corporate loss arising from dishonest acts of former employee Brock until after the time within which to discover and report such loss under the Crime Coverage section of the Federal Insurance Company Executive Protection Policy No. 8157-73-98A DOT had expired, and (2) that the "Cancellation As To Any Employee" condition of the Zurich policy, which took effect on August 1, 2002, does not preclude coverage for EPI's loss arising from dishonest acts committed by Brock before May 1, 2002, on which date coverage for Brock under the Federal policy ceased by virtue of Brock's March 31, 2002 termination. (Dkt.#140)

**IT IS FURTHER ORDERED** denying Zurich's motion for summary judgment. (Dkt.#147)

/ / /

**IT IS FURTHER ORDERED** that oral argument set for August 27, 2009 at 2:00 PM is hereby converted to a status hearing at which time a final pretrial conference date and a trial date will be set. The parties are instructed to meet and confer prior to the status hearing to discuss and resolve any issues that remain in light of this Order.

DATED this 29th day of July, 2009.

Mary H. Murguia
United States District Judge